Mr. Martin, whenever you're ready. Yes. I've asked for three minutes of rebuttal time, if that's acceptable. Great. To your honor. Thank you. May it please the court, my name is Craig Martin, and I'm appearing today on behalf of Sanofi Aventis, who is a counterparty to a contract that MP Ireland acquired under a Chapter 11 plan. That contract requires MP Ireland to pay a one percent royalty for. We're familiar with the facts. Okay. Thank you, your honor. The question is whether those royalty payments need to be made, and we submit that they do for two reasons. The first is because when a party acquires a contract out of a bankruptcy case and then uses that contract for its benefits, it's also obligated to pay for its burdens. And the second is that under the text of the bankruptcy code, when the debtor takes acts after confirmation of a plan that give rise to liability, that liability is not discharged. All right. Let's start with the statute. The word claim is very broad. It explicitly includes contingent ones. The word contingent, this falls within the dictionary definition of contingent. Why doesn't that resolve the case? It's broad. This is plausible. This is within it. End of story. I would say two reasons, your honor. The first is that the definitions of contingent talk about it being dependent or contingent on something else, and we contend that the something else here is the debtor's conduct, and that is discussed in this court's Grossman's decision. Grossman's is a tort case. In tort cases, we have different due process concerns or considerations because the parties aren't contemplating their due process limits, the amount of notice that someone would have. This is a contract case. The parties contracted for this. They knew it. They could have structured it as a license. They didn't. They could have structured it as a security interest. They didn't. They could have structured it as a rent to own. They didn't. So why should we be at all stinting or narrow in applying an otherwise broad word? Well, I'll turn to the second point that I was going to make, which is that the statutory language in 1141D1A talks about discharge of a debt that arose before the date of such confirmation. And I submit that if you were to use the broad definition of claim and contingent that you've suggested might apply here, that the language that arose before the date of such confirmation would be surplusage and that to give meaning to those words in the statute, it is appropriate to determine whether the liability arose before or after confirmation. And we submit that when the debtor, when MP Ireland makes sales, net sales, which is defined in the contract as either sales by them or some third party that they license to, that language requires the payment of the royalty post-confirmation. We don't contend that the amounts that arose pre-confirmation and pre-bankruptcy filing should be paid. It's about $6 million in this case. We concede that those arose before confirmation. But for those amounts that arise after confirmation, to give this language meaning, we submit that those should be paid. Okay, so then you're going back to the question of what does it mean to arise? Does it mean that the money has to be payable? That would seem to undercut the idea of something being contingent. Well, I think the guidance that we have on what arise means is, unfortunately, the mass tort cases. And we agree with Your Honor that those are slightly different. But I think what my friends have said in their briefing is that you should analogize the contract to a tort and that the moment the contract was signed in 2001, that's the act, and that the equivalent of damage from the tort is when they decide to sell. And we contend that that is not a proper analogy, that in 2001, when the contract was signed, MPI may have never sold anything. They may have sold some for a while and stopped. So the idea that it was known what that debt would be, we submit is not. Isn't that why the claim was contingent? Well, again, we contend that the claim doesn't arise until the sales occur. And the basis for the claim is the contractual promise, right? The basis for the claim is the contractual promise and the sale of the pharmaceutical in an amount in excess of $10 million as stated in the agreement. And so they are in control of whether that payment obligation arises or not. And therefore, we contend that contingency is something extrinsic to what the debtor does. So in the mass tort context, the manifestation of the disease, all of the conduct is completed, the sale of the mass tort product. We cite several briefs in our case, several cases in our briefing that deal with attorney's fees that arise post-confirmation. Or there's a case that we cite in our reply brief in Texaco where there were all cases. But where is this in the text if there has to be an extrinsic event? Again, Your Honor, we construe that from that arise before the date of confirmation. So if you say that contingency is so broad, it would essentially cover every relationship that a debtor has, irrespective of whether that relationship results in liability or not. And if the debtor then takes an asset out of the bankruptcy case and engages in conduct using that asset that they benefit from, the claim that arises out of that is post-confirmation and should be paid. Your best support for this is the Ninth Circuit and Siegel, but Siegel, the Ninth Circuit, later walked back from that. You've got a Fifth Circuit citation where, you know, the Fifth Circuit is relying on a bankruptcy court, but the cases didn't involve that. So you don't have a case that's really close to this one, do you? Well, I think we've gone back and forth on the Weinstein case, and that is a case by this Court, and I think it does provide some insight into this Court on how to decide this issue. And I submit to what that... Judge Ambrose is wrong about what he wrote in Weinstein. I believe so, and I'll tell this Court why. It's possible. I know it's a challenge. I don't say it lightly. I will note that I was on the briefing in Weinstein, so I know I don't carry as much weight as Judge Ambrose, but I was involved in that case. But what he says in the Court below is that the reason Weinstein shouldn't apply here is because there there was a voluntary acquisition, and here there's not, and that as a result, in this case, all the future royalties are a liability. I submit respectfully, of course, because I have great respect for Judge Ambrose, that that overlooks the fact that the contract here was in the bankruptcy estate. It was part of the bankruptcy estate, and the debtor chose to have that asset vest in a new entity, Reorganized MP Ireland. And that, in our view, is the same as a voluntary acquisition, and that the language in Weinstein that we rely on that says when a party voluntarily acquires an asset from a bankrupt entity and then uses that asset, it's to be liable for the payments and obligations that arise from that acquired asset. I think you had some concerns about Appellee's, Malincrut's proposed rule. What would it mean? Would it be difficult or unworkable in terms of filing a proof of claim before the contingency had occurred? I mean, what would be the problems with implementing their rule? So I think one big problem is that in order to file a claim for perpetual unknown sales, a creditor has to try to estimate the amount of the claim. That amount could be estimated. It could be allowed by the bankruptcy court, and then MP Ireland could stop selling. And suddenly there's a very large claim, unsecured claim, that's in the unsecured claim, but the amounts that would support that claim actually don't arise because the debtor decides not to sell the assets. All right. But that's also going to be kind of an issue in the mass tort context where there are a lot of future contingencies, and maybe they don't eventuate. Maybe people don't get asbestosis or whatever else. Yeah, and in the mass tort context, there's usually a trust distribution protocol where each injury is assigned a certain value, and the court actually does an estimation, a confirmation, as to whether the assets put into the trust are sufficient to compensate the expected economist and actuarial testimony and all of that. Here this was just an unsecured claim that was put into the MP Ireland unsecured creditor pool, which without our claim in it was about $12 to $14 million. And with our claim in it estimated at future sales, our original claim we filed was over $100 million. We did mediate that portion of it and agreed to a number of what those future sales might be. But if we don't prevail on this appeal, then that means our $45 million goes in with the $14 million. They stop selling tomorrow. We still get paid on our $45 million. So that's part of the reason that we think the rule creates an anomaly that could be corrected by focusing on the arise after confirmation language of 1141 D1A. If the parties had agreed in 2001, take out the part about selling the drug, which I understand is counterfactual. In the year 2050, we'll pay you $10 million. And then the bankruptcy arises and it concludes. Is that a contingent? What do you do with that claim? Does it get wiped out in the bankruptcy? Is it contingent? I think that claim would be a fixed claim in a known amount that would be discharged in bankruptcy. It's not contingent on other events other than the passage of time. And everyone's still being there. What if they said if you're, what if you say to your neighbor, if you still live next door to me, I'll give you, in 2050, I'll pay you $1 million. And then the bankruptcy comes and goes. 2050 comes. He's still there. When did that claim accrue? Well, I think if you, when you filed bankruptcy, you said to that person, please don't move because I want to pay you this 1.5 because, in fact, I get a lot of benefit of you being next door because you mow your grass, you take care of your bushes, and I'm worried that if you don't, if you move, that's not going to happen. And so I'm going to take that contract on after confirmation. If the event arises post-confirmation and that benefits the debtor, I would submit that that arises post-confirmation and should be paid. I see that I have 25 seconds left. I'm happy to continue fielding questions. Thank you. Ms. Sherry, whenever you're ready, if you're done. Good morning, Your Honors. May it please the Court, Melissa Arbasheri on behalf of the Debtor Appellee Mallinckrodt. There are three pieces of text that I think resolve this case. One is the text of the APA itself back in 2001. The second is the text of the bankruptcy code. And the third is text or maybe language is a better word in the Weinstein decision. So starting with the text of the APA, and, Judge Bevis, I think this is where you started. This is not a license. There's no property interest that Sanofi has with respect to ACAR. Everything vested, full title with respect to the assets, vested way back in 2001. And you could see that in the text of the APA. 2.1 of the APA, which is in the joint appendix at page 39, talks about the sale of the assets as of the effective date, which, again, is July 2001. If you go to section 2.4, which is on page 41 of the joint appendix, it talks about a security interest. They got a security interest when it came to the upfront payment, which was 2.3A, and with respect to the inventory, 2.3B, but solely and only with respect to those two aspects of the purchase price, not with respect to the royalty payment. They could have done that. They could have structured this as a license. They could have retained a property interest and said that if you don't pay the royalty, we get the property back. That happens all the time. In fact, I think the word royalty here is a little bit confusing because it tends to make you think of a license situation. That's not what we have. So every time they talk about the asset passing through bankruptcy or the benefit that the debtor retains as a result of post-bankruptcy, it's confusing two different things. The asset, the property, the IP, we own that. We've owned that for 20-plus years. The only thing that is in this APA today, the only continuing obligation in the APA, is an obligation. It's a liability. It is a debt. And that's what we're talking about here, deferred compensation. So that's the APA. Then you get to the text of the bankruptcy code. If you follow the language through, as Your Honor said, the definition of claim is broad. It is intentionally broad. It was amended when the code was adopted in 1978. Contingent was added. It was intended to be the broadest possible definition, no matter how remote, no matter how contingent, so that the bankruptcy court grant the broadest possible relief. Their reading either suggests that some things that the ordinary meaning would say are contingent are not actually contingent, or they would ask this court to distinguish between different kinds of contingencies depending on who is acting. Now, you can't get that from the word contingent. That's not the ordinary meaning. That's not the dictionary definition. And so they look to 1141 D1A and say, well, maybe you can get it from the timing aspect of it. It needs to arise before confirmation. But the problem with that is then it's not contingent at all. I mean, what they're really saying, in a contract case, which is way easier than a tort case. In a tort case, it's a little bit hard to figure out when a right to payment arises and there are due process concerns and notice concerns. In a contract case, you really only have two possible times. It either arises when the parties get together, write things down in an agreement, sign on the dotted line, and that was pre-petition, or it arises upon the contingency. But if it's the latter, then you're not really talking about a contingent right to payment anymore. At that point, it's a fixed right to payment. So that's within the language. But there are cases that seem to dial back the language a little bit, and maybe the tort cases are different. But what about the contract cases like Castellino-Villas where the debtor goes and does some frivolous litigation post-confirmation and they say, well, you can go ahead and recover for your attorney's fees in that situation. Are those kinds of limits wiped out? The bankrupt debtor can then use this as a sword and a shield and enforce the contract no matter what. They'd be free of those kinds of responsibilities? Yeah. So I think if you look at the contract cases, there are sort of the more traditional contract cases with the indemnification cases like Manville that all go the same way and say it's pre-petition. You have the installment contract cases like some of your hypotheticals. That's Columbia Gas and Stewart Foods is a Fourth Circuit case. They all go the same way. Then you have these attorney's fee cases, and there's really not that many. There's two that are actually based on a contract, one out of the Ninth Circuit, one out of the Eleventh. And like you said, the Siegel case out of the Ninth Circuit is sort of later explained in the Castellino decision as being based on this fair contemplation concept. And so in this context, I think some courts have said, you know, in addition to the dictionary definition, we're going to say it's not just any uncertain event in the future, but it's something that would be within fair contemplation of the parties. And I think what worried the court in those circumstances is the sword issue that you mentioned. And so these are instances where the claim was litigated, resolved in bankruptcy, and then afterwards, they essentially bring the claim again. They go to relitigate the same issue. And what the court says is, number one, it's not in fair contemplation of the parties of the time. But really, in addition, you are actually imposing a burden on your counterparty. So there is a sword, and it's not just any sword. You're actually picking up the same contract. I think Siegel was a breach of contract claim, at least in part. I think Shoresnap was saying that the mortgage was void under Vermont law. But in both of those cases, you're using the contract as a sword, and you're really, you know, kind of stabbing at your counterparty and forcing them to expend funds. Both of those are different here. I mean, if there's a fair contemplation test to be applied in the contract situation, it would be met in virtually every case because, again, you have a writing. It says everything you need to know. The debtor is taking some post-bankruptcy action that makes this distinguishable from the whole thing is set up beforehand. Yeah, and I think it's a post-bankruptcy action that isn't in fair contemplation but is also is against, is actively against the counterparty that causes the counterparty to have to do something. I mean, here, Sanofi has no obligations left. They're just sitting back and accepting a check. And, yes, they're not going to get paid money that they're otherwise due, but that's just the definition of debt. I mean, that's why we're here today, and that's what we're talking about. And so I think that's the text of the Bankruptcy Code. I do want to spend a minute on Weinstein because, in addition to the fact that Judge Ambrose wrote it, I think it really does resolve this case. The only way I don't say completely is because I realize it wasn't a holding. But if you look at what the court was talking about in Weinstein, it was sitting there and saying, and the issue there was whether or not it was an executory contract, and the money at issue were the prepetition royalties. Because if it was executory, they had to cure and pay it. If it was not executory, it would be a general unsecured claim. Excuse me. And so what the court was saying, and saying it was non-executory, and this is on page 506 of the decision, the court said, listen, you kind of shouldn't be that upset about it. You really should be grateful. And the word grateful is in the decision because if no buyer had come, if Spyglass wasn't here, no buyer came forward, the non-bankrupt counterparty would only have an unsecured claim against the debtor on which he typically expects to recover cents on the dollar. That is this case. If in Weinstein Spyglass hadn't come forward and said, let me buy this contract from you, I'll assume all post-closing obligations, then Cohen would have stayed with the bankrupt estate, and it would have been discharged as an unsecured claim in bankruptcy. There would not have been royalties going forward. And it was an express assumption. In fact, Judge Ambro and Weinstein, you see this in footnote 4 and footnote 8, wonders why. Why did Spyglass, they already own the assets. The IP had transferred back in around 2011 when the movie came out. And you could see this at the argument. This came up at the argument as well on Weinstein where the question was asked, okay, you already own the assets. The IP has transferred. All you have is this Cohen agreement where it's just the obligation to pay royalties. Why would you assume that? Why would you take on this additional responsibility? And there were some answers that were given about the IP, but you see in footnote 4 and footnote 8 of the decision. There's not really a clear answer, and that's why they were lucky. Could you talk a little bit about the practical issue? How is this going to work if we adopt your rule? How are people going to file claims? How are we going to value the claims? A lot of the power over this, as Appellant points out, is in your clients' hands here, so there's a danger of strategic manipulation. So two answers to that. One is as far as the notice issue and the claim issue, I think this is so much easier, like you said, than the tort cases where you have to kind of figure out all these unknown future issues. I mean, here they filed a proof of claim. There's no notice question. I mean, I think the concern in the tort cases is you don't even know you have a claim. You haven't been injured yet, so there's the unknown plaintiff problem. In a contracting situation, you don't have that. And Section 502 of the code actually specifically addresses what you do in the event of a contingency, and it gives the bankruptcy court the ability to estimate the contingency if it isn't going to get resolved quickly enough for it to be helpful to resolve the estate. And, in fact, in 502, I think it's B1, the bankruptcy code says you can disallow claims, but you actually can't disallow a claim just because it's contingent. The whole idea of incorporating contingent claims within the broad definition was that they wanted them to be included within the bankruptcy estate, and bankruptcy courts are used to estimating claims that are uncertain in the future, and so the uncertainty as to whether it's going to sell or what it's going to sell like is not that hard to consider. I mean, there's been 20 years of experience here that the bankruptcy court can draw on, and it was settled and resolved here. I think the other question about how this is going to work just goes to show, like, this is a very unique case because in most cases, and Judge Amber was kind of baffled by this at the argument when we were in the district court as to as a transactional lawyer, how do you come up with a contract where you're going to get paid in perpetuity and not keep any interest, right, not have a security interest, not have some sort of property interest? By doing that, you're really assuming the risk that something is going to go wrong, there's going to be insolvency or what have you, which is why in most of these contexts, you don't see this kind of agreement, and, in fact, in this bankruptcy itself, there are other royalty agreements that are out there. Their licenses, they specifically say we get to repossess the property if you don't pay, and we assume those contracts, and they're getting paid going forward. So I don't think this will come up very much. Sorry, I skipped over a question I wanted to ask about Weinstein. Because that case involved a 363 buyer. Why should we extend Weinstein to apply to reorganized debtor? Is there a textual reason to assume that those two types of assignments are equivalent, or shouldn't we think that the reorganized debtor has a greater interest in a fresh start? Yeah, so the difference between the buyer and the reorganized debtor in Weinstein is specifically the fact that the buyer voluntarily assumed the obligations, and so basically bought the contract, I think, is the way to think of it. If the buyer had not been there and it had stayed with the reorganized debtor, we would be having the same conversation that we're having here today. And so there really is a difference. In fact, I think the buyer at Weinstein, as the questions and arguments suggested in that case, didn't necessarily have to buy the Cohen agreement. Could have just walked away with substantially all the assets, including the IP, and kept distributing the movie going forward without paying any royalties. But for whatever reason, they decided to take on the future obligations, and that was to the benefit of Cohen. All right. Thank you very much. Thank you. Mr. Martin, your rebuttal. Yes, thank you. I want to say a few points. First, the asset we're talking about here is not the IP, it's the contract, and I think you touched on that with your question about why is there a difference between a 363 sale and a reorganized debtor acquiring the same type of contract under a plan. And I would submit the fresh start that your Honor asked about is a fresh start from the issues that created the financial liability. But there's a balance, and creditors continue to have rights. Some are expressly stated in the statute such as if it were to be an executory contract. With a non-executory contract, it's an asset of the estate, and irrespective of whether it passes from the debtor as a seller to a buyer, or whether it passes under a plan to an acquirer, or we submit the rule of law should be the same. Regarding the Weinstein, and that plays right into Weinstein, where on page 505, Ms. Arbuscheri quoted 506. But 505 says, in the case of a non-executory contract, where only the debtor has material obligations left to perform, the contract is a liability of the estate. That's the point that they want to make. But the very next clause says, and if the buyer wants to buy it, the buyer is voluntarily assuming that liability. That's just a simple matter of commercial and corporate law. When you acquire an asset from someone with liabilities, unless you expressly exclude them, you're acquiring those liabilities. Now, my friend at the bar says that our reading is that the claim is not contingent at all. And I think if you read our briefs, you see we argue that quite forcefully, that the claim here does not arise until when the sale occurs, and therefore our primary argument is that you don't even have to worry about the definition of claim and contingency because we believe that the claim doesn't arise until the sales occur. We then argue, of course, that if you disagree with us, then we get into the argument and discussion that we had earlier. So I think that the fear that we have is not only the one that we talked about with the claims and the difficulties around that. And, by the way, just for the record, there is a provision in the Bankruptcy Code that says contingent, can be disallowed as part of the claim process. So I'm not sure it's as easy as my friend stated. That would be in Section 502E1B. But the other issue is that if the rule of law is that, in fact, you don't have to assume the obligations under a non-executory contract, then if Weinstein had actually reorganized, then all of the parties and interests that retained what, in that case, was called a participation distribution, which is actually a retention of a right in the film, just as Sanofi here invented a drug that's very useful to the marketplace and they retained a 1% right to be paid for their invention in that drug. If you don't allow those rights to continue to be paid, Weinstein, I think they sold over 200 film titles for which there are obligations every time the film is showed to pay an actor, to pay a producer. If the answer is don't do a 363 sale, do a plan, and then you can not have to pay all those actors and producers, those inventors of drugs, et cetera, we submit that that's an inconsistent rule and we ask for consistency. If there's not a contingent claim, what would you call the potential claim that they have based on this contract? A potential claim, a theoretical claim? I would call it a contract right that hasn't matured and that matures at the time the sales occur. All right. Thank you. We thank both parties for excellent and helpful briefing and argument. We would ask that the parties work together to prepare a transcript and submit it to us.